## Silverco, Inc., Appellant, *v.* Zoning Board of Adjustment.

498

Argued April 21, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

C. Brewster Rhoads, with him Sidney L. Wickenhaver, Mortin E. Rotman, Montgomery, McCracken, Walker & Rhoads and Dennis, Rotman, Gorson & Cohen, for plaintiff, appellant.

James L. Stern, Deputy City Solicitor, with him Matthew W. Bullock, Jr., Assistant City Solicitor,

*Jerome J. Shestack,* First Deputy City Solicitor and *Abraham L. Freedman,* City Solicitor, for City of Philadelphia, defendant, appellee.

*Morris B. Levitt,* with him *William Kendall,* for intervenors, appellees.

OPINION BY MR. JUSTICE BELL, November 15, 1954:

On December 6, 1951, Silverco, Inc. applied to the Zoning Board of Adjustment for a variance and requested a use registration permit for the use of premises located at the Southeast corner of Swanson and Wolf Streets for cattle pens and a storage of hides. The premises are located in a district zoned "Industrial", a classification which does not permit the establishment of the proposed use without the grant of a variance. The petitioner did not propose to use the premises as a slaughter house, but only for the storage of live cattle and hides. All slaughtering operations and subsequent tanning of hides were to be conducted elsewhere.

Although the area was zoned Industrial, many nonconforming uses and variances had in fact converted most of the area to the "least restricted" uses. The nearest residences are 600 to 1000 feet away, with intervening industrial buildings or plants, including the alcohol distilling plants of Continental Distilleries and Publicker Alcohol Co. and an oil plant of Wilson-Martin, and a glue and fertilizer factory. Petitioner proposed to store the live cattle in 8 separate pens located 100 to 200 feet from the perimeter of the area and surrounded by a cyclone fence of steel mesh. It likewise proposed to lock the cattle securely within pens and had elaborate detailed plans to safely, so far as humanly possible, load, unload and pen the cattle. Protestants feared that cattle would escape and en-

danger the neighborhood; also that offensive odors would permeate the air. Witnesses for petitioner testified that no offensive odor is given off by hides when they are treated, as petitioner planned, with salt and chlorinated lime; that they cannot be smelled beyond 50 feet, and that they are not palatable to roaches or vermin because of the salt. This is in contrast to other industrial activities conducted in the immediate neighborhood, some of which give off obnoxious odors.

Petitioner advised the Board of Adjustment that it had signed a contract to purchase the premises provided the requested variance was granted. Petitioner was consequently a conditional purchaser whose position and rights were equivalent to those of an owner who desired a variance for the same purposes. *Elkins Park Impr. Assoc. Zoning Case,* 361 Pa. 322, 328, 64 A. 2d 783, 785; 62 C.J.S. §227 (12)b.

A proper notice of the proposed hearing was posted; the evidence was conflicting on the question of whether the notice remained posted for 10 days as required by §31 of the Philadelphia Zoning Ordinance of August 10, 1933.

On January 23, 1952, the Zoning Board of Adjustment, after hearing petitioner's evidence at a public hearing at which no protestants appeared, and after a physical inspection of the premises by members of the Board, unanimously granted the variance "on condition that all work is to be performed inside the building; that cattle will be housed at all times and never left to roam outside the building." Unfortunately no record of the testimony nor any statement or findings of pertinent and material facts was made by the Board to show the grounds of its decision or to justify its action in granting a variance, as required by the Act of May 6, 1929, P.L. 1551, §8: *Valicenti's Appeal,* 298 Pa. 276, 148 A. 308; *Imperial Asphalt Corporation of*

*Pennsylvania Zoning Case,* 359 Pa. 402, 59 A. 2d 121; *Lindquist Appeal,* 364 Pa. 561, 73 A. 2d 378.

On January 29, 1952, Silverco, in reliance upon the variance granted by the Board of Adjustment, made settlement, paid the purchase price of the property, namely $80,000., and took title thereto. It then commenced to alter and improve the premises for the use permitted by the variance.

A new Zoning Board of Adjustment was thereafter appointed by the new City Administration and on February 14, 1952, the Zoning Board of Adjustment, on protest from members of the community, ordered a further public hearing. Under the Act of May 6, 1929, §8, P. L. 1551, 53 PS 3829, protestants have 30 days within which to appeal to the Court of Common Pleas from the action of a Zoning Board of Adjustment. On the 29th day, namely, on February 21, 1952, certain protestants appealed to the Court of Common Pleas *No. 1* of Philadelphia County from the order of the original Zoning Board of Adjustment. The Court of Common Pleas No. 1 retained jurisdiction but directed the Board to retain the record until a further hearing was held by the new Board and a final decision rendered.

Shortly after the grant of a variance, South Philadelphia awakened to the possible dire results of this new cattle-hides storage and over 1000 persons signed a petition requesting the new Board of Adjustment to revoke the order of the original Board, being apprehensive, we repeat, that the proposed uses would create offensive odors and because they were fearful that cattle might break out and seriously injure persons or property in the heavily populated contiguous area.

The new Zoning Board of Adjustment held two public hearings and on May 13, 1952, revoked the permit issued to Silverco on January 23, 1952, by the

original Board of Adjustment on the grounds: (1) that the proposed uses would be offensive to the community because of noxious odors; (2) that serious injury and bodily harm could result from escaping cattle; and (3) that the property had not been adequately posted (for a period of ten days) prior to the original hearing.

The evidence on behalf of the protestants showed merely apprehension of danger and of noxious odors, and conflicted with the sworn positive and convincing testimony to the contrary by witnesses for Silverco. Moreover, the fact that over 1000 protestants signed a petition for revocation would not, of itself, be sufficient because, as this Court said in *Lindquist Appeal,* 364 Pa. 561, 565, 73 A. 2d 378: "It is clear that a board of adjustment does not properly exercise its discretion if it considers the number of protestants rather than the nature and quality of their objection."

With respect to the third ground, the testimony of two witnesses that they did not see the posted notice was negative testimony which was not of sufficient character, quality and breadth to overcome the positive testimony of "posting."

We therefore hold that the evidence was not adequate to sustain the grounds or reasons given by the second Board of Adjustment for revoking the variance.

However, that merely brings us to the most important issue in this case, namely, did Silverco prove facts which were sufficient under the decisions of this Court to justify the grant of a variance. On the record there is nothing to show that either the first or second Board of Adjustment or the Court below gave adequate, if any, consideration to this basic question. We deem it wise, therefore, to once again call attention to the pertinent principles which are here involved.

When Silverco, relying upon the variance granted January 23, 1952, by the (first) Board of Adjustment,

purchased the premises for $80,000., it knew or should have known that anyone aggrieved by the action or order of the Board of Adjustment could appeal therefrom in 30 days to the Court of Common Pleas. It therefore took whatever risks were involved if such an appeal were taken and were successful.*

Moreover, the new (or second) Board of Adjustment, within the 30 day period, to wit, on February 14, 1952, notified Silverco of its intention to hold further hearings, obviously with the intent to affirm, or alter, or revoke the action of the prior Board. We hold that the second Board of Adjustment had this power of review provided it exercised it within 30 days of the original order, since no indefeasible rights could vest in Silverco in the meantime.

In *Ventresca v. Exley,* 358 Pa. 98, 56 A. 2d 210, where a Board of Adjustment, without any showing of unnecessary hardship, granted a variance which had not yet been acted upon by the owner, this Court held that such variance was improperly and illegally granted and could be revoked by the Board. The Court, speaking through Mr. Justice, now Chief Justice STERN, said (page 102) : "If, then, the certificates of variance were improperly and illegally granted, it would seem self-evident that the Board of Adjustment had not only the right but the duty to revoke them even if there were no express grant of power of revocation given to the Board by statute or ordinance." See also *Wyszynski v. Philadelphia,* 370 Pa. 632, 636, 89 A. 2d 355, 357.

In order to obtain a variance the law is well settled that a *petitioner must prove* (1) the variance will not

---

* We note that certain protestants did take an appeal to the Court of Common Pleas No. 1 within the 30 day period, but after the variance was revoked by the new Board, abandoned their appeal.

be contrary to the public interest; and (2) *unnecessary* hardship will result if it is not granted: *Pincus v. Power,* 376 Pa. 175, 179, 101 A. 2d 914; *Devereux Foundation, Inc. Zoning Case,* 351 Pa. 478, 41 A. 2d 744; *Borden Appeal,* 369 Pa. 517, 521, 87 A. 2d 465; *Kerr's Appeal,* 294 Pa. 246, 144 A. 81; *Valicenti's Appeal,* 298 Pa. 276, 148 A. 308; Philadelphia Home Rule Charter, §5-1006 (1)(c), which restated part of §8 of the Act of May 6, 1929, supra. These authorities and others have pointed out with particularity what is meant by the words *"unnecessary* hardship". The first Board of Adjustment, we repeat, made no statement or findings of facts and recorded no testimony as it should have done to justify the grant of a variance. Although the second Board of Adjustment took testimony on matters which are herein unimportant, it failed to consider the basic question of unnecessary hardship which was the key issue.

Although the record was, for the reasons herein-above stated, barren of any evidence to prove unnecessary hardship and to justify the grant of a variance, Silverco took an appeal from the order revoking the variance and its use permit to the Court of Common Pleas No. 2 of Philadelphia County. That Court, without taking any testimony and without passing upon the basic issue involved, merely found that there was no abuse of discretion and no error of law and affirmed the order of revocation.

Although in view of the inadequate record it would have been wise for the Court below to take testimony upon the basic issue involved, this was not necessary.

Section 8 of the Act of May 6, 1929, supra, provides, inter alia: "If upon the hearing [before the Court of Common Pleas] it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence . . . The court may re-

verse or affirm, wholly or partly, or may modify, the decision brought up for review."

In *Pincus v. Power,* 376 Pa., supra, we said (page 179) : "Plaintiffs appealed from the refusal of the Zoning Board of Adjustment to grant the variance, to the Court of Common Pleas, which took additional testimony. The Court of Common Pleas had the power to hear the appeal and likewise had the power to hear evidence and to make such decision as, under the evidence and the applicable principles of law, was just and proper: Rolling Green Golf Club Case, 374 Pa. 450, 458, 97 A. 2d 523; Dooling's Windy Hill v. Springfield Township, 371 Pa. 290, 89 A. 2d 505; Lindquist Appeal, 364 Pa. 561, 73 A. 2d 378. . . ."

The principles applicable on an appeal from a Court of Common Pleas have been recently stated in *Rolling Green Golf Club Case,* 374 Pa., supra (page 458-9) : "On appeal from a decision of a Court of Common Pleas in a zoning matter the case comes before an appellate Court as on certiorari, and where there is adequate evidence to support the findings of the Court below and the proceeding is free from error of law and there has been no manifest abuse of discretion, the decision will not be reversed. Cf. Dooling's Windy Hill v. Springfield Township, 371 Pa., supra; Lindquist Appeal, 364 Pa., supra."

In the instant case the record is barren of any evidence adequate to support a variance and consequently the petitioner has failed to sustain its burden of proof and a variance cannot be sustained.

The Order of the Court of Common Pleas is affirmed. Each party shall pay its own costs.

506

As long as man serves meat on his table and wears leather on his feet, the animal kingdom will continue to pay tribute to the preservation of the human race. Cattle, of course, make the largest contribution to man's carnivorous appetite and his propensity to adorn his body, home and personal accouterments with products derived from the hides of beasts belonging to the bovine genus. In every population center in the United States, areas are marked out for the retention of cattle for the convenience of city dwellers who thus may obtain food and pelt minus the transportation costs from distant stockyards. In the City of Philadelphia 24 establishments receive and store approximately one-quarter of a million live cattle per year.

On December 6, 1951, the appellant here, Silverco, Inc., applied to the appropriate Zoning Board of Adjustment for a use registration permit which would allow the use of some 75,000 square feet at Swanson and Wolf Streets, Philadelphia for a cattle yard and hide house. The terrain involved was located in an industrial zone which, because of numerous nonconforming uses, had declined to an area of "least restricted" uses.

Silverco announced to the Board that although it had entered into agreement to purchase the property indicated, the acquisition would not be consummated unless the Board granted a variance which would permit the use of the land for cattle storing purposes. After a hearing held on December 26, 1951, the Board granted the variance and issued a Use Registration Permit with the conditions that "all work is to be performed inside the building; that cattle will be housed at all times and never left to roam outside the building." It was further understood that there would be no slaughter of cattle on the premises. Silverco ac-

cepted the conditions, paid $80,000 for the property and proceeded to enter into the business for which he had acquired the land. Less than a month later the Board which granted the variance was supplanted by another Board which, on March 18, 1952, held a new hearing and then, on May 13, 1953, revoked the certificate of variance, thus torpedoing the $80,000 investment made by Silverco on the assurances and official authorization of the old Board.

The action taken by the second Board was, in my view, unwarranted, unjust and, according to law precedent, without legal justification. The second Board stated that the "safety and welfare of the surrounding community" forbade the presence and operation of a cattle yard at the place described.

It was testified on behalf of those protesting the cattle yard that such an establishment would give off offensive odors and that cattle might escape to the peril of people in the adjacent area. In cases of this kind, it is of course necessary to ascertain the character of the neighborhood in which the establishment is to operate. The area involved, which for many years was a coal yard and accommodated horse stables as well, is bounded by two railroad tracks with the nearest residences located some 1,000 feet away. A chemical plant lies across Wolf Street from Silverco.

In the immediate vicinity of the appellant's property, the Continental Distilleries and Publicker Alcohol Company maintain alcohol distilling plants. Although the aroma of liquor can be pleasant to the nostrils of a whiskey-drinker, it cannot be assumed that anyone's olfactory sense, no matter how trained and experienced, can be so delicately attuned that it can pick out the whisky flavor over the odors of a glue and fertilizer factory, also in the immediate neighborhood. One of the witnesses testified at the hearing that the

smells emanating from the glue and fertilizer factory were of such potency that "when you pass the Delaware in a boat, it nearly knocks you down." It would seem that, as against so formidable an attack on the senses, the simple emanations of a live cattle yard might afford a pleasant relief.

One of the board members, Mr. Cohen, declared at the hearing that he intended to investigate the area to determine whether the appellant's establishment was strong-scented or not. That he was in earnest about this can be gathered from his declaration that: "I am going to spend some time in South Philadelphia, up and down, smelling everything I can smell."

It appears that three other members of the board accompanied Mr. Cohen on this olfactory tour. They came back and declared: "While at the time of the personal inspection by the four members of the Board of Adjustment the odors from the process were not seriously objectionable, nevertheless, the Board recognizes the possibility that with the advent of warm weather, this problem may also arise."

The Board was thus satisfied that while the appellant's establishment did not offend against the atmosphere of the Spring months, there was the possibility that it could make itself objectionable in Summer. In order to test out the possibilities of the summertime, Board Member Cohen decided to go on another smelling expedition. Accordingly, in July, 1952, he repeated his investigations. The record does not show what he smelt in July, but since the supplemental findings of fact handed down by the Board in October made no mention of summer odors, it can reasonably be assumed that the weather of July did not add to the essences of Spring. Had the Silverco cattle yard produced any odors remotely approaching the pungent exhalations of the fertilizer factory, they would undoubtedly have

been remembered in the crisp days of October as vividly as they would have been smelled in the ardent days of July.

Nor is there any evidence that the storing of the hides in the appellant's establishment constituted an attack on the nostrils of the people in the area. The testimony at the hearing demonstrated that the hides were so treated chemically that their presence could not be olfactorily detected even within 50 feet.

Those objecting to the granting of the variance argued, in addition, that cattle might escape from the Silverco establishment. The record shows that this objection was imaginative, illusory and to a certain extent self-inspired. A cow imprisoned within a thick-walled building behind steel meshed fences has as much chance of breaking through the numerous barriers as the processed products of beef and pork have of breaking out of the tin cans into which they have been hermetically sealed. Nathan Rosenberg, traffic manager for Silverco, testified that in 22 years of experience he had not one instance of cattle escape. It must be remembered at all times that the animals involved here are *domitae naturae,* not *ferae naturae.*

On June 17, 1952, the second Board allowed a second hearing to determine whether the appellant had posted the premises, as it was required to do, for 10 days prior to the date of the first hearing, namely, December 26, 1951. Five witnesses testified to seeing the notices, two witnesses testified to not seeing the notices. The Board believed the two witnesses and disbelieved the five. The Board's findings in this respect constitute, in my opinion, an egregious abuse of discretion. The fallacy of the Board's conclusions derives not from accepting two as against five witnesses, but from the reasons it advances for rejecting the positive testimony of the five witnesses.

For instance. (1) Mrs. Sophie Plunkett testified that on December 14, 1951, she saw men get out of a car and put up notices. She was then questioned as follows: "Q. Now, did you at any time after December 14 and between then and Christmas have occasion to walk by that portion of the premises? A. I did. Q. And when you walked by during that period, *between the 14th of December, the day of that snow storm, and Christmas, did you notice those signs still there? A. I did.*" *

The Board disposed of this important and precise testimony with the extraordinary statement: "An examination of the premises by one of the members of the Zoning Board of Adjustment discloses the great improbability of the posting of the Notices having been seen as testified by her on December 14 from inside her home, since the house is so constructed that she could only have made her observation by putting her head outside of the window on an admittedly stormy day."

But Mrs. Plunkett did not testify she looked out the window. What kind of reasoning excluded from the Board's mind the possibility, if not indeed the probability, that Mrs. Plunkett saw the posting by the simple expedient of looking out of a door which could easily be opened to note the unusual happening in the neighborhood?

And then, why did the Board ignore entirely Mrs. Plunkett's testimony that she saw the signs between *December 14 and Christmas Day?*

(2) John Ott, a United States mail carrier, testified that "about the middle of December," he saw the sign and read it. At the hearing he identified a photograph of the sign he had read. The Board discarded this vital testimony of an obviously disinterested wit-

---

* All italics mine, unless otherwise indicated.

ness with the statement that the witness did not see
the sign subsequent to that first observation. But the
witness explained that after his first reading of the
notice, it didn't concern him to make any further ob-
servations with regard to it.

(3) At the first hearing of the second Board, Sam-
uel Silverberg testified that he saw the signs daily be-
tween December 14 and December 25, 1951. A member
of the Board commented on Silverberg's testimony:
"We also have had to determine whether the notice
was posted in accordance with the requirements of the
Act, and we now have the statement of the gentleman.
*We have everything we need on the question.*"

This comment would certainly indicate that the
Board was satisfied that the premises had been prop-
erly posted. In its findings, however, on October 3,
1952, the Board brushed away Samuel Silverberg's
testimony cavalierly by saying that Silverberg had
not testified at the second hearing. His failure to tes-
tify at the second hearing did not nullify the testimony
at the first hearing which was accepted as bona fide
by the Board. Moreover, the Board itself said that it
did not want any repetitious testimony. It can also be
noted that the Board itself could have called Samuel
Silverberg if it had entertained any doubt as to his
testimony given at the first hearing.

(4) The Board found a convenient way also to ig-
nore the positive testimony of *Nathan* Silverberg who
categorically declared that he on December 14, 1951,
personally put up the signs. In an extraordinary dem-
onstration of fanciful logic, the Board declared that
Nathan Silverberg was not to be believed because when
he testified at the first hearing he had not mentioned
the notices. Thus, we find the Board disbelieving
*Samuel* Silverberg because he *did* testify at the first
hearing and not at the second, and then disbelieving

*Nathan* Silverberg because he did not testify about the notices at the first hearing but did testify at the second! It must be repeated here that at the first hearing the Board, after hearing Samuel Silverberg, said: "We have everything we need on the question" (of notices).

(5) The Board did accept the testimony of Oscar S. Bortner, member of the Philadelphia Bar. Bortner testified that on December 14, 1951, he personally obtained the notices from the Zoning Board of Adjustment and, with Nathan Silverberg, proceeded to the premises and posted them. The Board conceded that Bortner was a credible witness. In fact it paid him the compliment of saying that it accepted: "The testimony of Oscar S. Bortner at its full value." It then went on to say, however, that "it is quite possible that the signs were removed after they were initially attached." Of course, in this world of kaleidoscopic changes anything is possible, but it is to be hoped that in a legal proceeding, a presiding tribunal will not change its standards of proof from witness to witness. The Board would not believe that the signs had gone up at all because Mrs. Plunkett who testified to this fact could not, in the Board's reasoning, have thrust her head through a window into a storm, although no one suggested she had. However, when a reputable member of the Bar categorically testified to putting up the signs, the Board then assumed that the signs immediately melted away. And this, in spite of *positive* testimony that they were seen from December 14 up to Christmas Day, plus the testimony of a photographer who took pictures of the notices on December 17th.

The Board criticized Nathan Silverberg for having testified at the first hearing without mentioning the notices, but accepted the testimony of the protestants' witness Dougherty who also did *not* mention the notices when he appeared at the first hearing.

A meticulous study of the record imperatively impels me to the conclusion that the Board arbitrarily chose to ignore the testimony of the five witnesses presented by the appellant and equally arbitrarily accepted the testimony of the two witnessees advanced by the protestants.

The decision of the Court of Common Pleas in the court below to affirm the decision of the Board should, in my judgment, be reversed. Restrictions imposed by zoning ordinances are in derogation of common law rights and must be strictly construed. (*Lord Appeal*, 368 Pa. 121). The exact opposite was done in this case. In discussing zoning regulations, this Court said in *White's Appeal*, 287 Pa. 259, 266: "There is one matter that is quite certain, the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare. The exercise must have a substantial relation to the public good within the spheres held proper. *It must not be from an arbitrary desire to resist the natural operation of economic laws or for purely aesthetic considerations.*"

It is proper and just for any municipality to impose certain restrictions in certain areas for the betterment and improvement of the municipality as a whole, but it is absurd to say that the population shall be supplied with beef steak and then prevent the importation of beef. It would be a burlesque on society to proclaim that citizens shall be properly shod, and then deny shoe manufacturers an opportunity to obtain the hides from which shoe leather is made. Of course, some areas are not adaptable to industrialization of any character; others are. It would appear that the zone here in question is peculiarly fit for the appellant's type of business. Although the zone has been

labeled "Industrial," it has over the years, as previously stated, been converted into an area of "least restricted uses." If there is any suitable place for a cattle yard in a built-up locality, this is it, especially when we consider that the first Board laid down conditions which completely protected the surrounding neighborhood from any possible harm.

It is only natural that people in this area should protest against the appellant's business. Already they have to contend with a fertilizer and glue factory and a chemical plant. However, the willing inhabitants of an area which contains a testing ground for explosives cannot logically object to the chugging of railroad trains through their town. People voluntarily living next to a limburger cheese factory should not be heard to complain against the cultivation of a few garlic bushes by their neighbors. It is to be noted also in this case that much of the protestations are based on a misconception. Many of the protestants believed that Silverco intended to conduct the business of a slaughter house. This, of course, is not so.

Given the character of the district and the entirely legitimate and innocuous nature of the appellant's business, it would have been an abuse of discretion if the first Board had refused the variance. Equally, it was an abuse of discretion for the second Board to revoke the variance so properly and legally granted.

The case of *Triolo, et al. v. Exley, et al.*, 358 Pa. 555, covered a question similar to the one here at bar. The Zoning Board there granted a variance to permit the applicant to operate an abattoir at 838-840 Carpenter Street, Philadelphia. On appeal, this Court held that the granting of the variance was proper: "A slaughterhouse had been maintained on the premises in question for a period of approximately 10 years prior to 1915. Around 1918, a fire occurred and from

then until the time of the present application, the property has been used as a stable and as a garage, both industrial uses. . ." Maps and photographs introduced in evidence reveal that in the immediate neighborhood there are three poultry slaughtering houses, a warehouse, a garage, a butcher store, two produce stores, a fish store, and a bottling company. . . . On the foregoing evidence and having regard to the change of classification from 'A Commercial' to 'Industrial' the Board concluded that the neighborhood was predominantly devoted to 'Least Restricted' and 'Industrial Uses'; that the granting of the application would in no way violate the spirit of the Zoning Ordinance; and that, under the circumstances, an undue hardship would result upon appellee if the permit were not granted. We are in accord with the statement of the trial judge that 'Permission to operate a modernly equipped abattoir, under the circumstances, cannot be regarded as an abuse of discretion by the Board.' "

The circumstances in the case at bar are no less impelling than those indicated in the Triolo case just quoted from. To deny the appellant here the variance applied for is to deprive Silverco of property rights without compensation. With the granting of the variance by the first Board, the appellant acquired a vested right which neither the second Board nor the Court of Common Pleas had the authority to revoke or alter. In the absence of mistake, inadvertence or fraud, the revocation of the Use Registration Permit constituted reversible error. In *Ventresca v. Exley*, 358 Pa. 98, this Court said: (p. 103) ". . . if a permit or certificate has been *lawfully* granted and *has been acted* upon by reason of the property owner incurring obligations and proceeding to erect the building there may arise vested rights which are protected by the federal and state constitutions . . ." (Italics in original decision).

There is nothing in the record which even remotely suggests that the Registration Permit was not lawfully granted, and it is clear that the property owner has incurred grave obligations because of the issuance of the permit. Law and justice require that the decision of the lower Court be reversed.

Moving fairly, cautiously and legally, Silverco applied for a Use Registration Permit. After a hearing duly advertised, a Zoning Board granted that permit. On the basis of that Permit, Silverco expended $80,000. Despite inflation, high prices and the exorbitant cost of living, it still cannot be said that $80,000 is an insignificant sum which can indifferently be charged to experience with a Zoning Board.