2 A.3d 1174

Lori T. CHEPKEVICH and Jeff Chepkevich, Appellees

v.

HIDDEN VALLEY RESORT, L.P., Appellant

Supreme Court of Pennsylvania.

Argued March 3, 2008.

Decided June 21, 2010.

Jamie Lynn Lenzi, Gerard J. Cipriani, Cipriani & Werner, P.C., for Hidden Valley Resort, L.P.

Templeton Smith, Jr., Richard E. Rush, Thomson, Rhodes & Cowie, P.C., for Lori T. Chepkevich and Jeff Chepkevich.

Barbara Axelrod, The Beasley Firm, L.L.C., for amicus curiae Pennsylvania Ass'n for Justice.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Chief Justice CASTILLE.

This Court granted allocatur to address the issue of whether a skier may maintain a negligence action against a ski resort for injuries sustained while skiing or whether suit is barred by statute and/or a release signed by the skier. For the reasons that follow, we reverse the order of the Superior Court and reinstate the trial court's order granting summary judgment in favor of the appellant ski resort.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

■ On December 31, 2001, appellee Lori Chepkevich and various family members, including her husband, appellee Jeff Chepkevich, were skiing on the slopes of appellant Hidden Valley Resort, L.P. ("Hidden Valley"). Lori was a season pass holder at Hidden Valley and an experienced skier. After the family had been skiing for several hours, Lori's six-year-old nephew Nicholas had to return to the condominium where the family was staying because he was cold. Lori volunteered to return with Nicholas while the rest of the family continued skiing.

[1]. We view the record in this appeal from a summary judgment in the light most favorable to the non-moving party, with all doubts resolved in favor of the non-moving party. *See, e.g., Dean v. Commonwealth, Dep't of Transp.*, 561 Pa. 503, 751 A.2d 1130, 1132 (2000).

4

To return to the condominium, Lori and Nicholas planned to ride the "Blizzard" ski lift. Because Lori was concerned that Nicholas would have difficulty boarding the chair lift due to his small size and inexperience, she asked the lift operator to slow the lift before it reached them so she could ensure that Nicholas boarded safely. The operator replied that this lift had only one speed and could not be slowed.[2] According to Lori, the operator then agreed to stop the lift two times to allow them to board: first, when the chair was behind the bull wheel, to allow Lori and Nicholas to move out of the line of skiers waiting to board and position themselves in the path of the chair; then, a second time, just before the chair reached them, to allow them to board. After the lift was stopped the first time, Lori and Nicholas moved from the line and into the path of the chair. However, as the lift came around, the operator did not stop it again. Nevertheless, Lori safely boarded the lift, and the operator attempted to help Nicholas onto the moving seat by grabbing his shoulder and hoisting him up. Unfortunately, Nicholas was not properly seated, and he began to slip off the chair. Lori, who was seated, reached over and attempted to pull Nicholas onto the seat while shouting for the operator to stop the lift. The lift continued moving, and Lori and Nicholas fell. Nicholas was not seriously injured. Lori, however, suffered a dislocated shoulder and a fractured hip.

Appellees filed a lawsuit in the Somerset County Court of Common Pleas against Hidden Valley to recover damages for Lori's injuries and Jeff's loss of consortium. Appellees alleged that the damages were caused "solely and proximately" by Hidden Valley's negligence through its employee, the chair lift operator who stopped the lift the first time but not the second time. Hidden Valley filed an Answer and New Matter, alleging, *inter alia,* that appellees' lawsuit was barred by the assumption of the risk doctrine applicable to the sport of downhill skiing through Pennsylvania's Skier's Responsibility

2. Lori was aware of other lifts at Hidden Valley which had variable speeds and she would choose to use those with her seven year-old son, instead of a lift that could not be slowed. Dep. Testimony, 8/10/04 at 13–14.

Act, 42 Pa.C.S. § 7102(c) (the "Act"),[3] and the Release from Liability that Lori signed when she purchased her season pass to ski at Hidden Valley (the "Release").

The Release, printed on a single page and titled "RE-LEASE FROM LIABILITY," stated:

Skiing, Snowboarding, and Snowblading, including the use of lifts, is a dangerous sport with inherent and other risks which include but are not limited to variations in snow and terrain, ice and icy conditions, moguls, rocks, debris (above and below the surface), bare spots, lift towers, poles, snow-making equipment (including pipes, hydrants, and component parts), fences and the absence of fences and other natural and manmade objects, visible or hidden, as well as collisions with equipment, obstacles or other skiers. . . . All the risks of skiing and boarding present the risk of serious or fatal injury. By accepting this Season Pass I agree to accept all these risks and agree not to sue Hidden Valley Resort or their employees if injured while using their facilities regardless of any negligence on their part.

R.R. 58a. Hidden Valley moved for summary judgment and, following oral argument, the trial court granted the motion solely on the basis of the Release.

### a. Trial Court

In its opinion, the trial court first examined whether summary judgment should be granted based on assumption of the risk as embodied in the Act. The court determined that summary judgment was inappropriate under the Act because Lori had not assumed the risk of her injury. The trial court

3. As discussed further *infra*, the doctrine of assumption of the risk was largely replaced in this Commonwealth by a system of recovery based on comparative fault, embodied in the Comparative Negligence Act. 42 Pa.C.S. § 7102(a)-(b). But the Comparative Negligence Act was amended specifically *to preserve the doctrine of assumption of the risk* in actions arising out of the sport of downhill skiing. The "Skier's Responsibility Act" amendment recognized that "as in some other sports, there are inherent risks in the sport of downhill skiing. . . .The doctrine of voluntary assumption of the risk as it applies to downhill skiing injuries and damages is not modified by [42 Pa.C.S. § 7102](a) and (b)." 42 Pa.C.S. § 7102(c).

considered and distinguished this Court's opinion in *Hughes v. Seven Springs Farm, Inc.,* 563 Pa. 501, 762 A.2d 339, 344 (2000), where we held that the doctrine of assumption of risk barred a skier's lawsuit for damages arising out of a collision with another skier at the base of a ski slope, a risk determined to be inherent to the sport of downhill skiing.

The trial court found the Superior Court's decision in *Crews v. Seven Springs Mountain Resort,* 874 A.2d 100 (Pa.Super.2005), *appeal denied,* 586 Pa. 726, 890 A.2d 1059 (2005), more relevant to this case than *Hughes.* In *Crews,* the panel majority held that the risk of injuries arising out of a collision with an underage drinker on a snowboard was not inherent to the sport of skiing because, the majority reasoned, that particular risk could be "removed 'without altering the nature of the sport.'" 874 A.2d at 104 (quoting *Knight v. Jewett,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 709 (1992)).[4] The trial court reasoned that a skier assumes only the risk of injuries that: (1) occur while the skier is engaged in the sport of skiing; and (2) arise from risks inherent to the sport. The trial court concluded that Lori was engaged in the sport of skiing at the time of her injury but, under *Crews,* Lori did not assume the risk of lift operator negligence because that risk is not inherent to skiing. The trial court concluded that this specific risk "could be removed without altering the fundamental nature of skiing," and thus the Act did not bar appellees' lawsuit. Trial Ct. Slip Op. at 7.

The trial court then turned to the question of whether Hidden Valley was entitled to summary judgment on the basis of the Release. The trial court held that Lori was barred from recovery as a matter of law because the terms of the Release expressly exempted Hidden Valley from liability for the negligent acts of its employees. The trial court noted that the Release "disclaims any liability" for "injuries suffered while engaged in the activity detailed in the release, which

4. Judge Lally–Green dissented. She would have applied *Hughes* and the Act to hold that Crews had assumed the risk of a collision on the slopes, an inherent risk of skiing from which the ski resort did not owe a duty to protect him. *Crews,* 874 A.2d at 108.

specifically includes riding the chair lift." Trial Ct. Slip. Op. at 13.

Responding to appellees' assertion that the Release was invalid as against public policy, the trial court applied the test articulated by this Court in *Topp Copy Prods. Inc. v. Singletary*, 533 Pa. 468, 626 A.2d 98 (1993). In *Topp Copy*, this Court held that an exculpatory clause is valid where it does not contravene public policy, is between parties relating entirely to their private affairs, and where each party is a free bargaining agent so that the contract is not one of adhesion. 626 A.2d at 99. Strictly construing the Release against Hidden Valley as the party pursuing immunity under it, the trial court held that the Release did not contravene public policy, related entirely to the parties' private affairs, and was not a contract of adhesion. The trial court concluded that the Release was enforceable because it expressly disclaimed liability for the negligent acts of Hidden Valley's employees, and thus "relieves [Hidden Valley] from all liability for any negligence by its employee in the operation of the ski lift." Trial Ct. Slip. Op. at 14.

### b. Superior Court

On appeal, the Superior Court reversed and remanded in a published opinion. *Chepkevich v. Hidden Valley Resort, L.P.*, 911 A.2d 946 (Pa.Super.2006). Before the Superior Court, appellees maintained that the trial court correctly concluded that the Act did not preclude recovery because the alleged negligence of a lift operator is not an inherent risk of skiing. However, appellees argued that the trial court erred in holding that the Release barred their lawsuit.[5] Appellees averred

---

5. Appellees raised three issues in their brief in Superior Court:

 1. Whether a release exonerating a ski area from liability for injuries caused by the inherent risks of downhill skiing, regardless of negligence on the part of the ski area, precludes the signer thereof from suing the ski area for the negligent action of its lift operator in (a) failing to stop a chair lift to enable a six-year-old child to board after expressly agreeing to do so and (b) lifting the six-year-old child and placing him partially on a moving chair.

 2. Whether a release exonerating a ski area from liability for injuries caused by the inherent customary risks of downhill skiing regardless

that the plain language of the Release barred recovery for injuries caused by employee negligence only when the risk that led to the injury was inherent to the sport of skiing. Appellees argued that the risk that led to Lori's injuries was lift operator negligence, a risk not inherent to the sport of skiing, and therefore a risk not covered by the Release. Appellees maintained that, although the risk of falling off a ski lift may be inherent to the sport, the risk that a lift operator would expressly agree to stop the lift twice to enable a small child to board and then fail to do so, is not. Further, appellees argued that the trial court erred by failing to hold, in the alternative, that even if the Release had been otherwise applicable, the lift operator's alleged agreement to stop the lift a second time to allow Lori and Nicholas to board "superseded" the Release and rendered Hidden Valley liable for its employee's negligent "breach of an express promise."

In its response to appellees' Superior Court arguments, Hidden Valley asserted that the trial court correctly granted summary judgment based on the Release, which was valid and enforceable. Hidden Valley argued that the risk that leads to injury need not be inherent to the sport of skiing for an exculpatory clause to be valid and enforceable. Hidden Valley further argued that the risk of falling from a lift is indeed both inherent to the sport of skiing and specifically identified in the Release. Hidden Valley did not address appellees' alternative argument that the alleged promise by the lift operator superseded the Release and exposed the ski resort to a negligence action.

Hidden Valley also maintained that the trial court erred in rejecting its alternative argument that the Act independently barred appellees' claims as a matter of law. Hidden Valley

of negligence on the part of the ski area, precludes the signer thereof from suing the ski area for a ski area employee's negligence that creates a risk that is not an inherent risk of the sport of downhill skiing.

3. Whether [Lori's] agreement to the ski area's release from liability was superseded by the express agreement of the ski area's lift operator to stop the chair to enable [Lori's] six-year-old nephew to board the lift.

noted that the Superior Court could reject the trial court's legal conclusion that the risk of falling off a ski lift due to operator negligence is not inherent to the sport of skiing and thus is not encompassed by the Act. Hidden Valley argued that the trial court's construction of the Act was in conflict with our decision in *Hughes, supra,* which cautioned against a narrow and hypertechnical interpretation of what constitutes an inherent risk under the Act. Hidden Valley explained that the risk in *Hughes*—a collision with another skier at the base of the slope—was "common, frequent, and expected," and thus was properly held to have been assumed by the plaintiff skier. 762 A.2d at 344–45. Hidden Valley argued that lift-related injuries likewise are common and expected given that lifts are not fitted with any safety equipment and because riders frequently fail to board properly or attempt abrupt movements while riding. Thus, Hidden Valley argued that the Act applied to bar recovery, any claim of operator error was irrelevant, and summary judgment should be affirmed on this distinct ground.

In their Reply Brief, appellees responded to the argument premised upon *Hughes* and the Act by invoking the Superior Court's decision in *Crews, supra.*

The Superior Court panel first addressed the Act and *Hughes,* but only very briefly, distinguishing our decision in *Hughes* on the factual grounds that it "did not involve a claim of negligent operation of a lift operator," but "an injured skier who was struck from behind by another while she was propelling herself towards the ski lift after completing a downhill run." *Chepkevich,* 911 A.2d at 950. The panel did not explain the significance of this factual distinction for purposes of determining whether the Act barred appellees' suit. The panel then added that, "[s]ignificantly," the plaintiff in *Hughes* had indicated in her deposition testimony that, prior to the accident, she had read and was familiar with the Skier's Responsibility Code, which was posted at her resort. *Id.* Again, the panel did not explain why this second factual distinction rendered the Act and *Hughes* inapplicable here. The panel neither discussed nor relied upon *Crews. Id.*

Stating that its recent decision in *Beck–Hummel v. Ski Shawnee, Inc.*, 902 A.2d 1266 (Pa.Super.2006), was "more applicable" (presumably, more applicable to this case than the Act and *Hughes* ), the panel turned to the distinct question of the enforceability of the Release. *Chepkevich*, 911 A.2d at 950.[6] In *Beck–Hummel*, the Superior Court held that a material issue of fact existed as to whether an exculpatory release on the back of a snow tubing ticket was enforceable to bar a negligence action. 902 A.2d at 1275. The opinion set forth settled general principles respecting the enforceability of releases, stressing that: (1) releases are not favored in the law; (2) to be deemed enforceable, a release (a) must not contravene any policy of law; (b) must be a contract between individuals relating to their private affairs; (c) must involve free bargaining agents, rather than be a contract of adhesion; and (d) must spell out the parties' intent with particularity; and (3) a release must be construed strictly against the party claiming immunity under it. *Chepkevich*, 911 A.2d at 950–51 (citing *Beck–Hummel*, 902 A.2d at 1269). The panel herein noted that, although the ticket disclaimer in *Beck–Hummel* explicitly specified that the user assumed the risk of injury, that fact did not end the inquiry, and the *Beck–Hummel* panel looked for additional guidance in the RESTATEMENT (SECOND) OF TORTS, § 496B, which addresses "Express Assumption of Risk." [7]

In this case, the Superior Court relied on *Beck–Hummel* and found "particularly instructive" comment c to Restatement § 496B:

6. *Beck–Hummel* was decided after this case was briefed to the Superior Court, but before it was argued. The parties' briefs in the Superior Court obviously did not include the case; it appears that no subsequent pleadings were filed addressing it; and although the case could have been addressed at oral argument, the published opinion of the panel below makes no reference to any argument, from either party, on the applicability of *Beck–Hummel*.

7. Section 496B states: "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy." RESTATEMENT (SECOND) OF TORTS, § 496B.

In order for an express agreement assuming the risk to be effective, it must appear that the plaintiff has given his assent to the terms of the agreement. Particularly where the agreement is drawn by the defendant, and the plaintiff's conduct with respect to it is merely that of a recipient, it must appear that the terms were in fact brought home to him and understood by him, before it can be found that he has accepted them.

RESTATEMENT § 496B, CMT C; *Chepkevich*, 911 A.2d at 951.[8] The panel then construed the question before it to be "whether a reasonable person should have noticed a warranty disclaimer," and noted the following considerations as relevant to that inquiry: "(1) The disclaimer's placement in the document; (2) the size of the disclaimer's print; (3) whether the disclaimer was highlighted by being printed in all capital letters or in a type style or color different from the remainder of the document." 911 A.2d at 951 (quoting *Beck–Hummel*, 902 A.2d at 1274). In *Beck–Hummel*, the panel had stated that it could not "conclude as a matter of law that the disclaimer language on the ticket itself was sufficiently conspicuous such that, without any further indications from the ski facility, a purchaser would be put on notice of its contents." 902 A.2d at 1275.

Notwithstanding its discussion of *Beck–Hummel*, the panel herein did not compare the signed Release to the inconspicuous disclaimer located on the back of a ticket in *Beck–Hummel*.[9] Indeed, the Superior Court panel's analysis of the Release in this case was quite brief, was not clearly moored to the authority it had set forth (*i.e.*, *Beck–Hummel* and the

8. The Superior Court opinions in this case and in *Beck–Hummel* refer to comment *d* in apparent typographical errors. *Chepkevich*, 911 A.2d at 951; *Beck–Hummel*, 902 A.2d at 1273–74.

9. The *Beck–Hummel* panel noted that the ticket disclaimer there "was in a font size such that the photocopy of the ticket attached to the Hummels' brief was just barely readable ... Although the ticket stated 'PLEASE READ' in bold, above the disclaimer, the font size of this language was similar to the phrases on the bottom of the ticket, 'NON–TRANSFERABLE' and 'NON–REFUNDABLE.'" 902 A.2d at 1275. The "text was printed above a dotted line in the center of the ticket, along which the ticket is presumably intended to be folded." *Id.* at 1268.

Restatement), and was unresponsive to the arguments actually forwarded in the parties' briefs.[10] The panel first "noted" that the language in the Release stating that the holder of the season pass "agree[s] to accept all these risks and agree[s] not to sue" was in the same, "relatively small" font as the rest of the Release and was located in the final sentence of the first paragraph. 911 A.2d at 951. The panel then stated that it was "noteworthy" that the opening line of the Release provided that "Skiing, Snowboarding, and Snowblading, including the use of lifts, is a dangerous sport with inherent and other risks . . . ." *Id.* After these factual observations, the panel's entire substantive analysis of the Release consisted of the following conclusory paragraph:

> Significantly, the legal term "negligence" is not clearly defined or illustrated in any way, such as with an example of conduct that can be considered negligent. FN6. As such, [Hidden Valley]'s Release from Liability arguably amounts to an adhesion contract which provides no recourse to one who disagrees with it but to reject the entire transaction.

> FN6. Jeff purchased the 2001–2002 Season Ski Passes for Lori, their two sons, and himself on September 28, 2001 . . . . Though the date is not clear on the document itself, Lori believed she signed the Release from Liability form either the day before or the day of her accident. . . . . On that release, Lori's name appears on a signature line numbered 147, and she signed her minor son, Ryan's, name above hers on line 146. The form begins with a signature on line 129 and ends with a signature on line 167. In addition, Lori testified that though she had never skied at any resort other than [Hidden Valley], she did not read the exculpatory language on the Release from Liability form, nor did she indicate that she was ever verbally informed that she was entering into a contractual

10. Notably, the parties' principal and reply briefs in the Superior Court did not cite Restatement § 496B or the comments thereto, which were invoked by the panel below. At least in their written pleadings, then, the parties simply did not argue the points of law that the panel below deemed "more applicable" than *Hughes* and the Act.

agreement with [Hidden Valley] prior to executing the same.

*Id.* at 951–52.

This analysis does not appear to be related to the propositions the panel had derived from *Beck–Hummel* and the Restatement. Nor did the panel's analysis explain the significance, if any, of its factual observations—*e.g.,* that the font size was relatively small and that Lori claimed not to have read the Release before signing it—to its legal conclusion that the Release was "arguably" an adhesion contract. The reference to an adhesion contract, of course, hearkens back to the general test for determining the enforceability of exculpatory clauses. But the panel did not acknowledge that appellees had never argued that the release was an adhesion contract; it did not explain how an adhesion contract question related to the Restatement and *Beck–Hummel* authority it had just set forth; and it cited no supporting authority for its dispositive assertion that an exculpatory provision may be deemed an adhesion contract if it does not clearly define or illustrate negligence. In short, the panel's holding—that the Release "arguably" was an adhesion contract because it did not provide examples of negligent conduct and thus summary judgment was inappropriate—appeared to be a *non sequitur* unrelated to the parties' arguments and the panel's predicate and attenuated discussion of other arguments it deemed "more applicable" to this case. *Id.* at 950–51.

The panel lastly announced an alternative and independent holding crediting appellees' argument that there was an issue of fact—rendering summary judgment inappropriate—regarding the lift operator's alleged failure to honor an "agreement" to stop the lift twice to allow Lori and Nicholas to board, which agreement superseded the Release. The panel reasoned that it could not "conclude as a matter of law that the disclaimer is enforceable, as this question of fact remains as to what the ski lift operator said to [Lori]." *Id.* at 952. The panel thus remanded the case for further proceedings.

## II. ISSUES ON APPEAL

Hidden Valley filed a petition for allowance of appeal, and we granted review of four issues, three relating to the Release, and the fourth relating to *Hughes* and the Act:

(1) whether the Superior Court erred in holding that an exculpatory agreement whereby a skier assumes the risks of skiing regardless of negligence must define negligence and illustrate negligence by example;

(2) whether the Superior Court's decision conflicts with a later panel decision in *Nissley v. Candytown Motorcycle Club Inc.*, 913 A.2d 887 (Pa.Super.2006), on the issue of the validity and enforceability of an exculpatory agreement;

(3) whether the Superior Court erred in addressing the conspicuousness of the release and whether there was a contract of adhesion because these issues were never raised by appellees in the courts below; and

(4) whether the Superior Court erred in failing to affirm summary judgment on the ground that injuries incurred while boarding a ski lift are inherent to the sport and Lori assumed the risk, as a matter of law.

The overarching question of whether summary judgment is appropriate is a question of law, and thus our standard of review is *de novo* and the scope of review is plenary. *O'Donoghue v. Laurel Sav. Ass'n*, 556 Pa. 349, 728 A.2d 914, 916 (1999). Summary judgment may be entered only in those cases where the record demonstrates that there remain no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. *Dean v. Commonwealth, Dep't of Transp.*, 561 Pa. 503, 751 A.2d 1130, 1132 (2000). This Court's inquiry is confined to whether Hidden Valley is entitled to judgment as a matter of law, *i.e.*, whether appellees' suit is barred by the Act and/or the Release.

### a. Appellant Hidden Valley

First, Hidden Valley argues that the Superior Court departed from this Court's precedent in holding that, to be effective, an exculpatory agreement must define negligence and illus-

trate by example the type of conduct considered negligent. Hidden Valley asserts that nothing in our precedent requires that a release contain such a definition, specifically arguing that in *Hughes*, in addition to interpreting the Act, we also condoned the use and enforcement of exculpatory agreements that do not contain illustrations of negligent conduct. According to Hidden Valley, we held in *Hughes* that, because the skier there had purchased a lift ticket containing an assumption of the risk agreement and a covenant not to sue, the skier would be deemed aware of the "inherent risk" that she ultimately encountered when she collided with another skier at the bottom of a slope. Hidden Valley reasons that *Hughes*, read in conjunction with the Act, "give[s] legislative and judicial imprimatur to the exculpatory agreement that [it] sought to enforce in this case." Brief of Appellant at 11.

Hidden Valley further claims that the Release meets all of the requirements of a valid exculpatory agreement, and that Lori agreed to assume the risks of skiing by signing it. The result is that Lori assumed the risk of her injuries and agreed not to sue Hidden Valley even if, as the exculpatory agreement expressly stated, Hidden Valley or its employees were negligent. Hidden Valley further notes that this Court, the Superior Court, and federal courts applying Pennsylvania law have consistently upheld exculpatory agreements in the absence of any specific reference therein to negligence, citing *Topp Copy, supra*; *Cannon v. Bresch*, 307 Pa. 31, 160 A. 595 (1932); *Seaton v. East Windsor Speedway, Inc.*, 400 Pa.Super. 134, 582 A.2d 1380 (1990); *Valeo v. Pocono Int'l Raceway, Inc.*, 347 Pa.Super. 230, 500 A.2d 492 (1985); *Zimmer v. Mitchell & Ness*, 253 Pa.Super. 474, 385 A.2d 437 (1978), *aff'd per curiam*, 490 Pa. 428, 416 A.2d 1010 (1980); *Savarese v. Camelback Ski Corp.*, 417 F.Supp.2d 663 (M.D.Pa.2005); and *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169 (E.D.Pa.1990). Thus, Hidden Valley argues, the Superior Court's unexplained requirement in this case—that an exculpatory clause is arguably an adhesion contract if it does not define the term negligence and provide illustrative examples—runs counter to established law.

Hidden Valley further contends that the Superior Court's decision in this case conflicts with *Nissley, supra,* where another panel upheld summary judgment in favor of the defendant on the basis of a sports-related release from liability, there involving motorcycle riding and jumping. 913 A.2d at 892. According to Hidden Valley, appellees' argument here is similar to the plaintiff's argument in *Nissley, i.e.,* that the exculpatory clause applied only to those risks contemplated by the plaintiff at the time he signed the release. The *Nissley* panel rejected that argument, finding that a reasonable person would have understood that he was waiving all rights to sue, without qualification. *Id.* at 891. Hidden Valley contends that the Release Lori signed, like the release in *Nissley,* comprised an agreement to assume the risk and a covenant not to sue, and that the Release contemplated barring all suits, including those arising out of employee negligence.

Hidden Valley also argues that the Superior Court erred in finding that a question of fact existed on whether the Release Lori signed was an invalid contract of adhesion, since appellees did not raise that issue in the trial court or in the Superior Court. Hidden Valley contends that the decision the panel relied upon in finding a contract of adhesion, *Beck–Hummel, supra,* is distinguishable. In *Beck–Hummel,* the Superior Court found a snow-tubing ticket-back disclaimer to be invalid and unenforceable. But, according to Hidden Valley, the controlling issue in *Beck–Hummel* was whether the release reasonably communicated the existence of an exculpatory contract to the plaintiff snowtuber who was the user but not the purchaser of the ticket. Because the release language was located above a dotted line where the ticket was to be folded over a wicket, the *Beck–Hummel* panel held that summary judgment was improper because it could not conclude as a matter of law that the ticket language was sufficiently conspicuous to convey to the plaintiff that she had given up any legal rights. 902 A.2d at 1275. By contrast, Hidden Valley argues, Lori was a season pass holder who signed the Release herself, and the Release was printed on an 8½ by 11 inch-sized paper entitled "RELEASE FROM LIA-

BILITY." Further, Lori had a season pass at Hidden Valley the year preceding and the year subsequent to her accident.

Hidden Valley also claims that the Act independently bars the instant suit because the injury Lori sustained arose out of an inherent risk of skiing, as contemplated by the Act and discussed in *Hughes, supra.* Hidden Valley argues that when Lori decided to engage in the sport of downhill skiing, and more specifically when she decided to board the chair lift, she assumed the risk of the injury she suffered. Hidden Valley notes that injuries frequently occur on chair lifts when users, among other things, fail to board properly or fall off due to unexpected movements or weather conditions. Because the sort of injury at issue here is so common, Hidden Valley maintains, the risk of such an injury must be anticipated and expected by the lift's users. Based upon the frequency of such injuries, Hidden Valley contends that this common and anticipated risk is inherent to the sport of skiing and Lori therefore assumed that risk when she decided to use the lift.

Finally, Hidden Valley asserts that *Hughes* expressly counseled against a narrow reading of the Act, and that we should apply that general principle to our interpretation of what risks are inherent to the sport of skiing. Hidden Valley contends that the trial court's narrower definition of the risk involved in this case—that of lift operator negligence—is just the type of hyper-technical and unrealistic interpretation that this Court rejected in *Hughes.* Hidden Valley thus implies that *Crews,* upon which the trial court relied for its analysis of the Act, was an unwarranted departure from our decision in *Hughes.*

### b. Appellees Lori and Jeff Chepkevich

Appellees renew the arguments they forwarded below, both concerning the Release and the Act. Appellees argue that the Release Lori signed did not extend to the specific negligence of the lift operator that is at issue here, relying on the *Crews* panel's narrow definition of the risks that may be deemed inherent to the sport of skiing. In appellees' view, the Superior Court's remand for trial was correct irrespective of whether

the Release can be characterized as a contract of adhesion.[11] As to the claimed conflict with *Nissley,* appellees contend that the releases in the two cases are not analogous. The release in *Nissley* covered any injury the plaintiff suffered on the defendant's premises, without specifying what the risks might be. 913 A.2d at 890–91. Appellees argue that, by contrast, the Release Lori signed specified the risks she agreed to assume, which had the effect of limiting her agreement not to sue to injuries arising out of those specific risks. The sole limiting language in the *Nissley* release, according to appellees, referred to risks of danger "known" by the plaintiff, and that limiting language appeared below the provision that the signer was "giv[ing] up all [his] rights to sue." *Id.* at 890. As a result, the *Nissley* panel determined that the limiting language did not modify the covenant not to sue. *Id.* at 891. Appellees contend that the Release Lori signed begins with a list of inherent risks in skiing, followed by her release of liability and covenant not to sue. For this reason, appellees argue that the Release, on its face, applies only to those specific listed risks and should not be broadly construed like the release in *Nissley.*[12]

11. Appellees also claim that the Superior Court acted within its authority by addressing *sua sponte* whether the Release was a contract of adhesion. Noting that an appellate court is free to affirm a trial court's ruling for record-based reasons other than those given by the trial judge, appellees argue that a "natural corollary to that rule" should be that an appellate court may reverse *sua sponte* a trial court's decision for a reason not raised by a party. Brief for Appellees at 22. Appellees cite no authority to support this rather remarkable proposition. *Compare Steiner v. Markel,* 600 Pa. 515, 968 A.2d 1253 (2009) (appellate court cannot reverse a lower court judgment on a basis that was not properly raised and preserved by the parties).

12. Appellees make two additional claims regarding the Release, neither of which was included in their complaint. Appellees assert that the lift operator's promise to stop the lift was a supervening act of negligence that superseded the Release. Appellees also claim that the Release's forum selection clause—which mandates that a lawsuit against Hidden Valley be filed only in the Court of Common Pleas of Somerset County or the United States District Court for the Western District of Pennsylvania—renders the Release ambiguous. Appellees argue that this clause indicates Hidden Valley did not intend to bar completely all lawsuits against it. Appellees made these arguments for the first time in their response to Hidden Valley's motion for summary judgment;

On the question of whether their suit is barred by the Act, appellees argue that the Act does not apply because not all risks encountered by a skier can fairly be said to be inherent to the sport. Appellees posit that when a risk arises that is not inherent to the sport (or when a ski resort's negligence gives rise to an unexpected risk), the skier has not assumed that particular risk, and therefore retains the right to sue for resulting damages notwithstanding the Act's bar. Applying the standard articulated by the Superior Court in *Crews*, appellees argue that "inherent" risks are only those few risks that cannot be removed without altering "the fundamental nature of skiing." *Crews*, 874 A.2d at 105. Appellees assert that the risk of lift operator negligence can be "removed" from skiing without altering the fundamental nature of the sport and, therefore, that risk is not inherent to skiing. Accordingly, appellees argue that Lori did not assume the specific risk that led indirectly to her injury and thus she is not precluded from recovery under the Act.

In response to Hidden Valley's argument that *Hughes* demands a broad reading of what risks are "inherent" to skiing under the Act, appellees counter that *Hughes* never expressly stated that every risk arising on a ski slope is necessarily assumed by the skier. Instead, appellees again invoke *Crews*, and argue that the Superior Court there properly recognized that the category of risks inherent to skiing is significantly narrower than Hidden Valley contends. Appellees also submit that *Crews* is more germane to the facts here than *Hughes*. Specifically, according to appellees, *Crews* held that, while the risk of colliding with another person on the slopes is an inherent risk under *Hughes*, the risk of being struck from behind by an intoxicated minor is not. Appellees reason that, just as the Superior Court defined "inherent risks" in *Crews* narrowly, so too the risks assumed by Lori should be defined not as the general risks of using the ski lift, but as the specific risk of lift operator negligence. Under *Crews*, appellees assert, such a risk is not inherent to the

appellees apparently did not file a reply to Hidden Valley's New Matter, which raised the Release as an affirmative defense.

sport because lift operator negligence could easily be removed without altering the fundamental nature of skiing. Appellees therefore conclude that Lori did not assume the risk of her injury under the Act.

## III. THE SKIERS RESPONSIBILITY ACT [13]

First, we consider the Act, which provides the statutory context within which the Release operates. The trial court held that the Act did not bar appellees' lawsuit, citing *Crews*. Although the Superior Court was presented with arguments pertaining to the Act, the panel focused instead on the validity of the Release and did not render a holding on the Act's applicability, notwithstanding that the alternative argument, if meritorious, would have required affirmance. This lapse has introduced a level of complexity that could have been avoided.

As noted above, the doctrine of assumption of the risk was largely eliminated in the Commonwealth when the General Assembly enacted the Comparative Negligence Act in 1987. 42 Pa.C.S. § 7102(a)-(b). Nevertheless, shortly after enacting the Comparative Negligence Act, the General Assembly amended the statute to include the Skier's Responsibility Act, 42 Pa.C.S. § 7102(c). The Act states:

(c) Downhill Skiing.—

(1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

(2) The doctrine of voluntary assumption of the risk as it applies to downhill skiing injuries and damages is not modified by [42 Pa.C.S. § 7102](a) and (b).

Thus, the Act explicitly preserved the common law assumption of risk defense as applied to injuries suffered while

13. We have reordered the issues presented for ease of logical discussion.

engaged in downhill skiing. *See Hughes*, 762 A.2d at 341. Because the Act did not create a new or special defense for the exclusive use of ski resorts, but instead kept in place longstanding principles of common law, a review of those principles is instructive. The assumption of the risk defense, as applied to sports and places of amusement, has also been described as a "no-duty" rule, *i.e.*, as the principle that an owner or operator of a place of amusement has no duty to protect the user from any hazards inherent in the activity. *See* RESTATEMENT (SECOND) OF TORTS, § 496A, CMT c, 2 (where plaintiff has entered voluntarily into some relation with defendant which he knows to involve the risk, he is regarded as tacitly or impliedly agreeing to relieve defendant of responsibility, and to take his own chances); *Hughes*, 762 A.2d at 343–44 (citing *Jones v. Three Rivers Mgmt. Corp.*, 483 Pa. 75, 394 A.2d 546 (1978)). Our decision in *Hughes* made clear that this "no-duty" rule applies to the operators of ski resorts, so that ski resorts have no duty to protect skiers from risks that are "common, frequent, and expected," and thus "inherent" to the sport of downhill skiing. Where there is no duty, there can be no negligence, and thus when inherent risks are involved, negligence principles are irrelevant—the Comparative Negligence Act is inapplicable—and there can be no recovery based on allegations of negligence. *See, e.g., Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000) (primary element in any negligence cause of action is that defendant owes a duty of care to plaintiff).

Accordingly, in *Hughes*, we laid out a two-part inquiry for determining whether a skier assumed the risk of a particular injury, asking first whether the skier was engaged in the sport of downhill skiing at the time of the injury, and second, whether the injury arose out of a risk inherent to the sport of skiing. *Hughes*, 762 A.2d at 344. In answering the first question, we clarified that "the sport of downhill skiing encompasses more than merely skiing down a hill. It includes those activities directly and necessarily incident to the act of downhill skiing. Such activities include **boarding the ski lift,** riding the lift up the mountain, alighting from the lift, skiing

from the lift to the trail and, after a run is completed, skiing towards the ski lift to start another run or skiing toward the base lodge or other facility at the end of the day." 762 A.2d at 344 (emphasis added). Because the sport of downhill skiing encompasses all these necessarily associated activities, we further determined that the risk of downhill skiing must include the risks inherent to them. We reasoned that to construe the Act otherwise would be to interpret it improperly in "an extremely narrow, hypertechnical and unrealistic manner." *Id.* Thus, we concluded that skiing towards the lift after completing a run was part of the sport of skiing and, as to the second part of the inquiry, we determined with little difficulty that colliding with another skier was an inherent risk of skiing because such collisions are common, frequent, and expected. Therefore, we held that the injured skier was barred by the Act from recovering damages and summary judgment was appropriate. *Id.* at 345.

We have not addressed the Act since *Hughes*, but the Superior Court has done so, and it applied a much narrower definition of "inherent risks" in *Crews, supra.* The panel majority there concluded that the Act did not bar an injured skier's claim against the ski resort because the specific risk of collision on the slopes with an allegedly intoxicated minor was not inherent to the sport of skiing. The majority held that this particular danger was a risk that "could be removed without altering the fundamental nature of skiing." *Crews*, 874 A.2d at 105. As noted, Judge Lally–Green dissented and would have held that Crews had assumed the risk of a collision. *Id.* at 108.

For purposes of our decision here, we need not ultimately determine whether we agree with the decision in *Crews* or with the limitation that *Crews* seems to have placed upon our holding in *Hughes*.[14] It is enough to state, consistently with

14. We did not accept review here to consider *Crews*. Moreover, *Crews* is distinguishable on its facts. *Crews* involved alleged underage drinking on the defendant's property, of which the defendant had notice—circumstances that may lead to liability on various grounds, for very important public policy reasons. *See, e.g.,* 18 Pa.C.S. § 6310.1 (prohibiting selling or furnishing liquor or malt or brewed beverages to

*Hughes*, that boarding and riding a ski lift are inherent to the sport of downhill skiing and inherently dangerous activities, the most obvious danger of which—a risk that is common, frequent and expected—is undoubtedly falling from the lift. Clearly, it is this very obvious and common risk that prompted Lori to ask the operator to stop the lift. But the lift operator had no duty to comply with Lori's request; boarding a moving ski lift is simply how this aspect of the sport is done. *See Jones, supra* (where defendant did not deviate in some relevant respect from established custom plaintiff may not recover in "inherent risk case"). And, despite the fact that the operator did not stop the lift a second time as requested, Lori herself still boarded it in the face of a well-known and obvious danger—and did so safely. It is difficult to imagine a clearer example of assumption of the risk, and there can be no viable claim of negligence under such circumstances. *See, e.g., Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120 (1983) (landowner owes no duty to protect against known and obvious dangers presented by icy patch on parking lot surface); *Jones, supra* (sports facility owes no duty to protect against "common, frequent and expected" risks which are inherent in the amusement activity, and where defendant has not deviated in some

minors); *Orner v. Mallick*, 515 Pa. 132, 527 A.2d 521 (1987) (there is exception to general rule against social host liability where adults furnish minors with alcohol; legislature has made judgment that minors under the age of twenty-one are "incompetent to handle alcohol" and thus adults owe them a duty of care prescribed by law). Thus, the decision in *Crews* may be construed as aimed at a certain salutary result but with an insufficient attention to teachings from this Court.

We do note that, by defining an inherent risk **only** as one that "could be removed without altering the fundamental nature of skiing," *Crews* encourages plaintiffs to plead cases to define the risks that led to their injuries in a narrow, hypertechnical manner. *Crews* invites the argument that an allegation of negligence by a ski resort will always negate any defense of the assumption of the risk, as the "risk of negligence" can always be removed without altering the nature of skiing. Such an approach fails to account for the "no-duty" rule and is contrary to the legislative intent to preserve the assumption of risk defense for downhill skiing. Neither the common law assumption of the risk doctrine, nor our decision in *Hughes*, suggested such an interpretation of inherent risks. Instead, those authorities direct that inherent risks are those that are "common, frequent, or expected" when one is engaged in a dangerous activity, and against which the defendant owes no duty to protect.

relevant respect from some established custom). Where there is no duty, there can be no negligence, and the General Assembly recognized this principle in its preservation of the doctrine of assumption of the risk for downhill skiing.

Indeed, the clear legislative intent to preserve the assumption of the risk doctrine in this particular area, as well as the broad wording of the Act itself, dictates a practical and logical interpretation of what risks are inherent to the sport. *See, e.g., Bjorgung v. Whitetail Resort, L.P.,* 550 F.3d 263 (3d Cir.2008) (ski resort owed no duty under Pennsylvania Skier's Responsibility Act to protect skier from lack of safety netting, improper course plotting and placement of course gates, or soft loose snow; "cognizable risks inherent in ski racing are legion"); *Burke v. Ski America, Inc.,* 940 F.2d 95 (4th Cir. 1991) (under Pennsylvania law, ski resort had no duty of care to injured skier because inherent dangers of skiing "double black diamond" expert slope with rocks and trees were obvious); *Smith v. Seven Springs Farm, Inc.,* 716 F.2d 1002 (3d Cir.1983) (under Pennsylvania law, skier assumed risk of injury when he voluntarily chose to ski expert slope after viewing other skiers having trouble with steep, icy slope, and seeing that unpadded poles from snowmaking equipment lined center of headwall); *Savarese, supra* (skier was barred from recovery under Pennsylvania law where injury occurred while he attempted to board ski lift when bottom of chair was not folded down for seating; relying in part on *Hughes* and the Act). It would frustrate the purpose of the Act were we to hold that it mandates a broad reading of the "sport of skiing," but simultaneously requires a narrow definition of what risks are "inherent" to that sport.[15] We therefore reject appellees'

**15.** Many other states have taken up the task of defining "inherent risks," either in their legislatures or their courts. Since 1978, of the states with a significant skiing industry, all but three have enacted some form of assumption of risk legislation. *See* 45 Am. Jur. 3d Proof of Facts 115, 23 (2008). The statutes vary greatly: some states have adopted statutes preserving the doctrine of ordinary care (Connecticut, Maine, Nevada, New Jersey, New Mexico, North Carolina, New York, Washington), *see id.* n. 55, while others have adopted various forms of assumption of risk (*e.g.,* Idaho, Tennessee). *Id.* n. 57–58. Of the states with assumption of risk statutes, some states narrowly interpret inher-

argument that Lori did not assume the "specific risk" involved here. We hold instead that appellees' action for damages arises out of the "general risk" of falling from a ski lift, which is an inherent risk of skiing from which Hidden Valley owed no duty of protection, and thus is barred by the Act. Hidden Valley was entitled to summary judgment on this ground.

## IV. THE RELEASE

We turn now to the Release, which was the focus of the published opinion below. Even if the Act did not bar appellees' action against Hidden Valley—that is, even if appellees could show that Hidden Valley breached some duty to appellees and thus was negligent—summary judgment was properly entered on the basis of the Release.[16] The general

ent dangers, thus allocating responsibility between skiers and ski area operators (*e.g.*, Colorado). *Id.* n. 59. Others have adopted a stricter assumption of the risk rule, holding the skier solely responsible for her injury regardless of how the injury occurs (*e.g.*, Tennessee). *Id.* n. 57. Still other statutes specifically enumerate what risks are inherent (*e.g.*, Idaho). *Id.* n. 58. Although the statutes of other states vary greatly, Pennsylvania's Act is unusual in its brevity and failure to give any definition of an "inherent" risk of skiing.

16. We recognize the force in Mr. Justice Baer's position that we need not reach this alternative holding. Concurring Op. at 40-42, 43, 2 A.3d at 1198-99, 1200. However, there are no hard and fast rules governing such alternative expressions where the record and arguments are adequate. Instead, consideration of alternative holdings is subject to prudential concerns, and we believe there are strong prudential reasons to consider the Release here. First, both lower courts focused on the Release in their divergent decisions. Second, the Superior Court erred in its review of the trial court's decision, its error being two-fold and interrelated: in a published opinion, it both failed to address adequately a preserved argument (regarding the Act), and it misapprehended governing law concerning the theory it did address (regarding the Release). In such a case, our review is both explicative and corrective—as to both theories—and a failure on our part to resolve the matter of the Release would leave in place the Superior Court's erroneous conclusion. Finally, we specifically accepted questions related to the Release, and they have been fully briefed and argued in this Court. Under the circumstances, we believe that review of the Release is appropriate. Cf. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 606 n. 15 (2007) (citing C.J.S. Courts § 143 for proposition that an "adjudication on any point within the issues presented by the case cannot be considered a dictum"); *Com. ex rel. Fox v. Swing*, 409 Pa. 241, 186 A.2d 24, 26 (1962) (where a decision rests on two or more grounds equally valid, squarely raised and at issue in the proceedings

standards governing such exculpatory provisions have been summarized by this Court as follows:

It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion. *Princeton Sportswear Corp. v. H & M Associates,* 510 Pa. 189, 507 A.2d 339 (1986); *Employers Liability Assurance Corp. v. Greenville Business Men's Association,* 423 Pa. 288, 224 A.2d 620 (1966). In *Dilks v. Flohr Chevrolet,* 411 Pa. 425, 192 A.2d 682 (1963), we noted that once an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence. In interpreting such clauses we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause. *Dilks,* at 434, 192 A.2d at 687.

*Topp Copy,* 626 A.2d at 99 (the "*Topp Copy/Employers Liability* standard"). The panel below adverted to these general standards while discussing *Beck–Hummel,* which decision also cited to *Employers Liability, supra.* The panel here nevertheless concluded that the Release as written could not support summary judgment because the term negligence is not defined or illustrated, and therefore the Release "arguably

both in the lower court and in this Court, none may be relegated to the inferior status of obiter dictum).

amounts" to a contract of adhesion. 911 A.2d at 951–52. This largely unexplained analysis cannot survive scrutiny.

First, it is not clear why the panel adverted to adhesion contracts in its summary conclusion, given the cited standards which preceded that conclusion. It is true that the *Topp Copy/Employers Liability* standard, which governs the enforceability of an exculpatory provision, states that such provisions are invalid if they amount to contracts of adhesion.[17] But the panel had been looking to *Beck–Hummel*, and its reliance upon the Restatement, in assessing "express assumption of risk," and more particularly, whether the facts supported a conclusion that the person against whom the Release was invoked had actually assented to its terms. The *Beck–Hummel* panel did not tie this analysis back to the adhesion contract element of the *Topp Copy/Employers Liability* standard for assessing exculpatory provisions, but seemed to view it as a distinct issue when an exculpatory provision is held up as proof of an express assumption of risk.

 In any event, the panel herein plainly erred in suggesting that the Release could be deemed to be an unenforceable contract of adhesion. Indeed, voluntary participation in inherently dangerous sporting activities does not easily lend itself to a claim that an exculpatory agreement governing that activity is an invalid adhesion contract. An adhesion contract is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usu[ally] a consumer, who adheres to the contract with little choice about the terms." BLACK'S LAW DICTIONARY 342 (8th Ed. 2004). But the Superior Court itself has cogently expressed why voluntary sporting or recreational activities may be viewed differently from other activities that require execution of exculpatory

**17.** Because the *Topp Copy/Employers Liability* standard refers to contracts of adhesion, we will assume, without deciding, that the Superior Court did not err *per se* when it inquired into this specific element *sua sponte*. Accordingly, we will not separately address the third question we accepted for review, nor do we pass upon appellees' novel suggestion that it is appropriate for appellate courts to raise *sua sponte* independent grounds to support a **reversal** of a lower court decision. Instead, we focus on the panel's substantive analysis of the adhesion contract element of the test.

contracts. In *Valeo, supra,* which involved automobile racing, the panel reasoned as follows:

Automobile racing is hazardous. It gives rise to various situations in which injury or death may result to drivers and mechanics. Experienced racedrivers, such as appellant, are aware of the risks attending the sport of automobile racing. Therefore, it is not unusual for participants to examine the conditions of the raceway before agreeing to enter an event and then to release the sponsor of the event and the owner of the raceway from liability for injuries to person or damage to property occurring while the raceway is being used.

Such agreements are not contracts of adhesion. Each party is free to participate or not to participate; a race driver is under no compulsion, economic or otherwise, to engage in automobile racing on a track whose condition he has examined. An agreement exculpating the sponsor of the race and the owner of the track does not contravene public policy. It is a contract between individuals pertaining to their private affairs and does not impair generally the rights of members of the public. Such an agreement meets the test for validity enunciated in *Zimmer [supra]*. Its exculpatory provisions, therefore, are enforceable.

It must be conceded, of course, that contracts providing for immunity from liability are not favorites of the law and will be construed strictly. Nevertheless, where the intention of the parties is spelled out with particularity and their agreement shows an unequivocally expressed purpose to release from liability, the law will give effect to that agreement.

500 A.2d at 493 (citations omitted).[18]

As we have stated, downhill skiing—like auto racing—is a voluntary and hazardous activity, and that fact is acknowl-

18. We have no objection to Mr. Justice Saylor's call for a prospective refocusing of the appropriate terminology in considering these sorts of exculpatory clauses in cases involving voluntary, hazardous activities. Justice Saylor questions the accuracy of prior Pennsylvania cases in describing such exculpatory clauses as something other than contracts of adhesion, suggesting that the choice in terminology may reflect a desire to enforce the contract "notwithstanding the lack of any opportu-

edged in the Act as discussed above. Moreover, an exculpatory agreement conditioning use of a commercial facility for such activities has not been construed as a typical contract of adhesion. The signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity. *See Schillachi, supra* (exculpatory clause valid under Pennsylvania law where activity is purely recreational); *Grbac v. Reading Fair Co.*, 521 F.Supp. 1351, 1355 (W.D.Pa.1981), *aff'd*, 688 F.2d 215 (3d Cir.1982) (exculpatory clause releasing stock car racing company from liability for death arising out of recreational race not invalid contract of adhesion under Pennsylvania law). The signer is a free agent who can simply walk away without signing the release and participating in the activity, and thus the contract signed under such circumstances is not unconscionable. Moreover, the absence of a definition or illustration of negligence does not render this Release an invalid contract of adhesion; that factor simply does not relate to the concerns implicated by adhesion contracts. Thus, the panel's reversal of the grant of summary judgment cannot be sustained on grounds that the Release "arguably amounted" to an invalid contract of adhesion.

It is also apparent that the Release here is valid under the other elements of the *Topp Copy/Employers Liability* standard, aside from adhesion contract concerns. First, the Release cannot be said to contravene any policy of the law. Indeed, the clear policy of this Commonwealth, as embodied

nity for the customer to bargain over specific terms." Concurring Op. at 42, 2 A.3d at 1198. Justice Saylor suggests recognizing that such clauses indeed amount to adhesion contracts, but that the relevant question is "whether the contract as a whole is unconscionable, and determine unconscionability based on general principles." *Id.* It may well be true that "Lori could not dicker over the terms of the form contract," *id.* at 41, n. 2, 2 A.3d at 1198, n. 2, and so the Release here was a contract of adhesion. But as the cases indicate, such contracts executed in the course of voluntary participation in recreational activities have not been declared unenforceable on these grounds, presumably because we recognize an inherent policy-based distinction between "essential" activities (such as signing a residential lease) and voluntary, non-essential ones (such as engaging in dangerous sports).

by the Act, is to encourage the sport and to place the risks of skiing squarely on the skier. 42 Pa.C.S. § 7102(c)(2). Furthermore, Pennsylvania courts have upheld similar releases respecting skiing and other inherently dangerous sporting activities. *See, e.g., Wang v. Whitetail Mountain Resort*, 933 A.2d 110 (Pa.Super.2007) (citing Superior Court panel's decision in instant case, but upholding release as applied to snow tubing accident); *Nissley, supra* (upholding exculpatory agreement that released defendant motorcycle club from "all liability"); *Zimmer, supra* (upholding exculpatory clause releasing ski rental shop from liability for injury suffered when skier's bindings failed to release during fall). And, finally, the Release Lori signed is a contract between the ski resort and Lori relating to their private affairs, specifically Lori's voluntary use of the resort's facilities.

Turning from the facial validity of the Release to its enforceability, the *Topp Copy/Employers Liability* standard requires us to construe the Release strictly against Hidden Valley to determine whether it spells out the intention of the parties with particularity and shows the intent to release Hidden Valley from liability by express stipulation, recognizing that it is Hidden Valley's burden to establish immunity. *Topp Copy*, 626 A.2d at 99. This examination could encompass the question of the relevance, if any, of the Release's failure to define negligence and to provide illustrations of negligence.[19]

Hidden Valley does not dispute the propriety of the Superior Court's reliance on *Beck–Hummel* and the Restatement in assessing the enforceability of the Release. Instead, it appears Hidden Valley views the panel's analysis as if it were all a part of a review to determine whether the Release is a contract of adhesion. Frankly, it is not clear to us that the panel's analysis of the Release was solely for the purposes of the adhesion contract determination. In any event, for pur-

19. Although the panel below cited the failure to define or illustrate negligence in support of its adhesion contract analysis, we understand appellees to be arguing the point in the broader context of the enforceability of the Release.

poses of review, we will assume the propriety of resort to *Beck–Hummel* and the Restatement. Nevertheless, we believe that *Beck–Hummel* is distinguishable on its facts.

As we have stated, the Release in this case was a full page titled "RELEASE FROM LIABILITY" in capital letters in large font at the top. The actual language releasing Hidden Valley from liability regardless of its own negligence was written in the same font as the rest of the Release, and Lori signed that Release. The Release here did not resemble the disclaimer in *Beck–Hummel, supra,* which was printed on the back of a lift ticket, did not require a signature or acknowledgment, and was printed on the portion of the ticket that would be folded out of sight of the user. Whether or not Lori availed herself of the opportunity to read the Release she signed, we cannot agree that a full-page, detailed agreement, written in normal font and titled "RELEASE FROM LIABILITY" constitutes an insufficient effort on the part of Hidden Valley to inform Lori of the fact that, by signing and purchasing a lift ticket, she was giving up any right she might have to sue for damages arising from injuries caused even by negligence. Further, Lori voluntarily chose to engage in the sport of downhill skiing solely for recreational purposes, and was under no compulsion to sign the Release. The mere fact that Lori would not have been permitted to ski at Hidden Valley had she not signed the Release does not render it an adhesion contract; the Release related to a purely recreational activity, and Lori was free to ski or not. Further, there is no evidence that Lori tried to negotiate the terms of the Release. We therefore conclude that the Release is valid under the *Topp Copy/Employers Liability* standard.

We next consider the Superior Court's conclusion that the Release is "arguably" an invalid adhesion contract because it did not define "negligence." 911 A.2d at 951–52. Characterizing *Zimmer, supra,* as the "seminal case" on exculpatory release law in the context of winter sports, Hidden Valley avers that that decision firmly establishes that the word "negligence" need not even be present in an exculpatory agreement for the agreement to bar negligence suits. In

*Zimmer*, a skier signed an exculpatory agreement releasing a rental shop from liability and then brought a negligence suit for injuries he sustained when the bindings of his skis did not release during a fall. The *Zimmer* panel cited to *Employers Liability* and rejected the skier's argument that his suit was not barred because it was based on negligence, and the term "negligence" did not appear in the release. 385 A.2d at 439. The *Zimmer* panel reasoned that general language in the release exempting the rental shop from any liability necessarily included liability arising from alleged negligence. *Id.* at 440. This Court affirmed.[20] *See also Topp Copy*, 626 A.2d at 99 (exculpatory clause absolving lessor of "any and all liability" covers negligence even though word "negligence" does not appear in clause).

Because an exculpatory agreement need not contain the word "negligence" in order to effectively bar suits arising out of negligence, Hidden Valley posits that it would be illogical to deem an agreement inadequate that **does** include the term, even if the term is not accompanied by definition or illustration. We agree. Pennsylvania courts have consistently held that exculpatory clauses may bar suits based on negligence even where the language of the clause does not specifically mention negligence at all. *See, e.g., Topp Copy, supra; Cannon, supra; Nissley, supra; Seaton, supra; Valeo, supra; Zimmer, supra.* It strains common sense to suggest that releases that fail to mention the word "negligence" should consistently be interpreted as barring suits based on negligence claims, while a release that clearly states that suits are barred "regardless of negligence" would not bar such suits. We see no reason to require the drafters of exculpatory releases to provide definitions and context for commonly used terms such as "negligence," nor do we believe that mention of the word exposes the drafters to a liability they otherwise could properly avoid. The Superior Court's conclusion that

20. This Court issued a one-sentence *per curiam* opinion affirming the Superior Court. *Zimmer*, 416 A.2d at 1010–11. Justice Roberts filed a dissenting opinion, in which Justices Larsen and Flaherty joined. *Id.* at 1011.

the absence of a definition of "negligence" alone may invalidate the Release is erroneous.[21]

Notably, appellees do not argue that the Superior Court correctly decided that the Release was potentially unenforceable because it failed to define and illustrate negligence. Instead they claim that, because the Release listed certain types of **risks** it covered, its effect is **limited** to those enumerated risks. Specifically, appellees argue that the Release exempted Hidden Valley from liability only when its negligence gave rise to a risk otherwise inherent to the sport of skiing. Appellees' argument on this issue purports to be a textual one: they first point to the language of the Release listing risks involved in skiing, which "include but are not limited to variations in snow and terrain, ice and icy conditions, moguls, rocks, debris ..., bare spots, lift towers [and] poles," and stress that all of these

21. As suggested in the second question presented for our review, the Superior Court's holding is further undermined by its own later decision in *Nissley, supra.* The plaintiff in *Nissley* became a member of Candytown Motorcycle Club and, as a condition of his membership, executed a "Release and Indemnity Agreement" containing both an assumption of the risk clause and a covenant not to sue. The specific language of the agreement provided that Candytown would not be liable for **any** injury to the plaintiff, but did not mention "negligence." While riding his motorcycle on the club's premises, the plaintiff was injured when he went off a jump and collided with a tractor that was on the course performing maintenance. The plaintiff sued, arguing that Candytown was negligent because the tractor could not be seen by riders and there were no flagmen warning of the tractor's presence. Candytown moved for summary judgment, arguing that the claim was barred by the release, and the trial court granted the motion. The Superior Court affirmed, relying on the *Topp Copy/Employers Liability* test. 913 A.2d at 890–91. Responding to the plaintiff's argument that the agreement was ambiguous because it did not mention negligence, the *Nissley* panel reasoned that there was no such ambiguity because the release "explicitly states that the signer was giving up all rights to sue." *Id.* at 891. Therefore, "a reasonable person would have understood, from the very beginning, that he was waiving all rights to bring a claim, without qualification." *Id.*

The Release here includes language specifically barring suits arising from employee negligence, while the *Nissley* release simply stated that the signer gave up "all [his] rights to sue ... for any injury." *Id.* But a logical interpretation of *Nissley* establishes that an exculpatory agreement bars negligence suits even without the inclusion of the word "negligence." *See also Wang, supra* (similarly worded exculpatory release, which included word "negligence," deemed enforceable).

examples are risks inherent to the sport of skiing. Appellees then claim that, by enumerating risks inherent to downhill skiing and then requiring the skier to accept **those** risks, the Release only bars suits that arise out of the listed risks. Appellees emphasize that the word "negligence" is grammatically tied to the enumerated risks, as the Release states that the signer agrees to accept "all these risks and agree[s] not to sue Hidden Valley Resort . . . regardless of any negligence on their part." Because the term "negligence" appears in the same sentence as the clause stating that the skier agrees to accept "these" risks, appellees argue that the Release only bars suits arising out of negligence that causes a risk inherent to skiing as defined in the Release, and not negligence giving rise to other unexpected risks not inherent to the sport. Appellees thus posit that the Release essentially did define and give examples of covered "negligence," but that the negligence alleged here lies outside what was contemplated.

We reject appellees' argument. The Release provides that "Skiing, Snowboarding, and Snowblading, **including the use of lifts,** is a dangerous sport with **inherent and other risks . . . .**" R.R. 58a (emphasis added). Moreover, the plain language of the Release does not limit its effect to risks inherent to the sport of skiing as later enumerated, but clearly includes "other risks." The Release later reiterates that "**All** the risks of skiing and boarding present the risk of serious or fatal injury." *Id.* (emphasis added). The very next sentence refers back to "these risks" and absolves Hidden Valley regardless of negligence. For purposes of decision here, we need not determine the validity of the Release with regard to risks other than inherent risks—as we have noted, use of the ski lift and the attendant dangers are inherent to the sport of skiing, and so were properly encompassed by the exculpatory language of the Release.[22]

22. On the question of the construction of the Release, we note our respectful disagreement with Justice Baer's suggestion that the Act—by manifesting a public policy that downhill skiing contributes to the Commonwealth's economy and that skiers must therefore assume the inherent risks of the sport—also establishes a "public policy" that precludes parties from contracting to release "other risks" as well.

Thus, the Release aims to bar suits arising out of "inherent risks" of skiing, in conjunction with the underlying purposes of the Act. Although the outcome in this case was certainly unfortunate, the risk was not so unexpected, or brought about in so strange a manner, as to justify placing this injury beyond the reach of the plain language of the Release, which specifically noted that riding the ski lift is a risky activity. Lori herself subjectively recognized and anticipated that falling off the lift was an inherent danger of its use, as she attempted to reduce the risk by speaking with the operator in advance. The fact that the operator allegedly was negligent in failing to stop the lift—and that ultimately there could be no real assurance of safety in such activities—underlines the inherent risk involved. Thus, the allegation of negligent behavior on the part of Hidden Valley does not alter the fact that Lori, in deciding to use the ski lift after expressly signing away her right to sue for injuries caused by the use of that lift "regardless of any negligence," assumed the risk of such negligence.

Hence, we agree with the trial court that the Release, construed against Hidden Valley as required by the *Topp Copy/Employers Liability* standard, clearly encompassed the risk at issue here as a matter of law. The Release also clearly spelled out the parties' intention to release Hidden Valley from liability for injuries arising from the risk accompanying the use of a ski lift, regardless of any negligence on the part of the ski lift operator. As the Release expressly states that the signer agrees to release Hidden Valley from liability should injuries occur, the Release meets the *Topp Copy/Employers Liability* enforceability test.

Finally, we hold that the Superior Court panel erred in holding that the lift operator's alleged agreement to stop the lift modified or superseded Lori's agreement, pursuant to the Release, not to sue Hidden Valley for any negligent acts of its

Concurring Op. at 33-34, 2 A.3d at 1194. Indeed, our cases make it clear that an exculpatory clause is valid where it does not contravene public policy, where the parties' bargain relates to their own private affairs, and where there is no contract of adhesion. *See, e.g., Topp Copy, supra.* The Act is silent on other risks; it does not purport to adopt a policy limiting the freedom of skiers to expressly assume other risks.

employees. First, as noted, appellees did not make this allegation in their complaint. Appellees nonetheless argue here that the lift operator had apparent authority to modify the Release, and that the lift operator's alleged agreement to stop the lift was a modification of the clause of the Release barring suits against Hidden Valley for the negligence of their employees. Even assuming that the lift operator had the authority to modify the Release, the agreement to stop the lift did not purport to do so. Moreover, the promise was directed to assisting Nicholas (not a party to this action) rather than Lori, an experienced skier. In any event, whether or not the lift operator agreed to stop the lift, there is no allegation that he somehow told Lori that he was thereby bestowing upon her the right to sue Hidden Valley should she be injured while boarding or riding it.

The terms of the Release explicitly encompassed the negligence of Hidden Valley employees, and negligence by an employee is precisely what appellees alleged here. An allegation of employee negligence cannot overcome the express terms of the Release barring just such suits for employee negligence.

## IV. CONCLUSION

Accordingly, we reverse the order of the Superior Court and reinstate the order of the Court of Common Pleas of Somerset County granting summary judgment for Hidden Valley. Jurisdiction relinquished.

Justice TODD and Justice McCAFFERY did not participate in the consideration or decision of this case.

Justice SAYLOR and EAKIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice BAER files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, and write to express my belief that, in the future, this Court should use more precise language than has been used in a line of past decisions regarding the enforceability of liability releases contained in adhesion contracts.

The majority references decisional law from this Court explaining that, for an exculpatory clause to be enforceable, it must satisfy several conditions, one of which is that it cannot be a contract of adhesion. *See Topp Copy Prods. v. Singletary*, 533 Pa. 468, 471, 626 A.2d 98, 99 (1993). The majority concludes that the release was not an invalid adhesion contract because it pertained to a voluntary recreational activity rather than essential services. *See* Majority Opinion, *Op.* at 27-28, 2 A.3d at 1190-91. As the majority recognizes, this analysis is consistent with holdings of the Superior Court, *see id.* at 27-28, 2 A.3d at 1190-91 (quoting *Valeo v. Pocono Int'l Raceway*, 347 Pa.Super. 230, 232–33, 500 A.2d 492, 493 (1985)), as well as two federal district courts, *see id.* at 27, 2 A.3d at 1190-91 (citing *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169, 1172–73 (E.D.Pa.1990), and *Grbac v. Reading Fair Co.*, 521 F.Supp. 1351, 1355 (W.D.Pa.1981), *aff'd*, 688 F.2d 215 (3d Cir.1982)).

Based on this line of decisions, the law, as it presently exists, supports the position that the release was not an adhesion contract. However, I believe that the case law to this effect is not well grounded, and that the manner in which it has developed has added unnecessary confusion to the issue because, by definition, an adhesion contract is simply one that the customer must accept or reject, with little or no opportunity to bargain over its terms, regardless of its subject matter. *See id.* at 27, 2 A.3d at 1190 (quoting Black's Law Dictionary to the effect that an adhesion contract is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usu[ally] a consumer, who adheres to the contract with little choice about the terms"). In other words, as a general proposition an adhesion contract is a take-it-or-leave-it agreement that the customer must sign in order to purchase the goods or services in question, regardless of the

nature of those goods or services—that is, irrespective of whether they pertain to the essentials of life or mere recreational activities. *See generally Carnival Cruise Lines v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (upholding a forum-selection clause in an adhesion contract for a pleasure cruise).

Unfortunately, in my view, the case law pertaining specifically to liability releases has applied a specialized definition for adhesion agreements whereby an agreement to immunize a seller from liability for negligence only constitutes a contract of adhesion if the customer is under a substantial economic compulsion to consummate the transaction, which presumably is not true of voluntary recreational activities. As noted, this specialized use of terminology is not well grounded. It can be traced to a decision of this Court from the 1960s involving a residential lease. *See Galligan v. Arovitch*, 421 Pa. 301, 219 A.2d 463 (1966). The Court in *Galligan* refused to apply a release clause to the tenant's suit because the clause did not cover the area of the premises where she was injured. *See id.* at 303, 219 A.2d at 465. After the Court reached this holding, the authoring Justice—Mr. Justice Cohen—writing only for himself, proceeded to opine that, because a residential tenant lacks bargaining power concerning a prospective lease agreement with the property owner, there can be no meeting of the minds as to the specific provisions of the lease, including any release from liability in favor of the landlord. Justice Cohen did not reference any authority for this proposition, and ultimately only cited to a passage in a law review note to support his conclusion that such clauses need not always be enforced. *See id.* at 304, 219 A.2d at 465 (citing Note, *The Form 50 Lease: Judicial Treatment of an Adhesion Contract*, 111 U. PA. L.REV. 1197, 1206 (1963)). Notably, that portion of the Note discussed judicial invalidation of liability releases contained in adhesion contracts based on the harshness of the result as well as factors unique to adhesion contracts; it did not suggest that the determination of whether a take-or-leave contract is properly labeled an adhesion contract depends on the level of economic compulsion experienced by the tenant.

Notwithstanding its status as *dicta* expressing the opinion of a single Justice, that portion of *Galligan* was relied upon, in *Employers Liability Assurance Corporation v. Greenville Business Men's Association*, 423 Pa. 288, 224 A.2d 620 (1966), for the concept that all releases contained in adhesion contracts are invalid. *See id.* at 291–92, 224 A.2d at 623. *Employers Liability*, in turn, was referenced in *Princeton Sportswear Corporation v. H & M Associates*, 510 Pa. 189, 507 A.2d 339 (1986), for a similar proposition. *See id.* at 193, 507 A.2d at 341. In turn, both *Greenville* and *Princeton Sportswear* were cited in *Topp Copy* as support for the position that exculpatory clauses are invalid if they appear in contracts of adhesion. *See Topp Copy*, 533 Pa. at 471, 626 A.2d at 99. *Topp Copy* and *Employers Liability* comprise the primary authority that the present majority references in reciting the rule—which now appears to be embedded in Pennsylvania law—that exculpatory provisions are invalid if they amount to contracts of adhesion. *See* Majority Opinion, *Op.* at 25-27, 2 A.3d at 1189-90.

In my view, Justice Cohen's basic premise in *Galligan*—that there can never be a meeting of the minds as to the provisions of an adhesion agreement—appears doubtful, as there is no apparent reason why a tenant or consumer could not read, understand, and agree to the terms of an adhesion form contract, or alternatively, refuse to go forward and, instead, seek another supplier offering more desirable terms. *See generally* Richard A. Posner, Economic Analysis of Law 127 (5th ed. 1998) (Economic Analysis) ("The sinister explanation for the form contract is that the seller refuses to dicker separately with each purchaser because the buyer has no choice but to accept his terms. This assumes an absence of competition."). Moreover, since the 1960s, courts and legal scholars have attained a better understanding of market dynamics and the potential benefits of standard form contracts, *see, e.g., Carnival Cruise Lines*, 499 U.S. at 594, 111 S.Ct. at 1527 ("[I]t stands to reason that passengers who purchase tickets containing a forum clause like that at issue in this case benefit in the form of reduced fares reflecting the savings that the cruise line enjoys by limiting the fora in which it may be

sued."); ECONOMIC ANALYSIS, at 128 ("It is not obviously wiser for the consumer to decide to pay more for a product than to decide to give up one of his legal remedies against the seller."),[1] and inquiries into such issues as "fundamental fairness," *id.* at 595, 111 S.Ct. at 1528, and unconscionability, *see, e.g., Lechmere Tire & Sales Co. v. Burwick,* 360 Mass. 718, 277 N.E.2d 503, 506 (1972), predominate over any concept that adhesion contracts are invalid *per se* as not reflecting a meeting of the minds. This Court's recent decision in *Salley v. Option One Mortgage Corp.,* 592 Pa. 323, 925 A.2d 115 (2007), for example, noted that the degree of economic compulsion motivating the customer is but one of several factors to be considered in evaluating whether an adhesion contract is unconscionable and, thus, unenforceable. *See id.* at 341, 925 A.2d at 125 (quoting *Delta Funding Corp. v. Harris,* 189 N.J. 28, 912 A.2d 104, 111 (2006)). Although the adhesion contract in *Salley* involved an agreement to arbitrate disputes rather than to release the provider from liability, the principles enunciated regarding adhesion contract validity are not unique to arbitration clauses.

In the end, I believe that the tendency among some courts to describe take-or-leave contracts for voluntary amusement

1. Judge Posner proffers the following explanation as to form contracts generally:

> When a transaction is between a large corporation and an ordinary individual, it is tempting to invoke the analogy of duress ... and conclude that the terms of the deal are coercive.... The purchaser can sign it or not as he pleases but there is no negotiation over terms. It is an easy step ... to the conclusion that the purchaser lacked a free choice and therefore should not be bound by onerous terms. But there is an innocent explanation: that the seller is trying to avoid the costs of negotiating and drafting a separate agreement with each purchaser. These costs, of which probably the largest is the cost of supervising the employees and agents who engage in the actual contract negotiations on the company's behalf, are likely to be high for a large company that has many contracts. Consistent with the innocent explanation, large and sophisticated buyers, as well as individual consumers, often make purchases pursuant to printed form contracts.

ECONOMIC ANALYSIS, at 127. In the present case, it was clear that Lori could not dicker over the terms of the form contract, particularly as her signature was the nineteenth of 39 signatures on the form in question. *See* R.R. at 58a.

or recreational services as not constituting adhesion contracts—when they clearly are—reflects a desire to give effect to the essential understanding that such contracts should, under proper circumstances, be enforced notwithstanding the lack of any opportunity for the customer to bargain over specific terms. In my view, it would be better to recognize that such terminology is anomalous because, as noted, it is inconsistent with the terms employed relative to adhesion contracts in other settings, and, just as important, it does not reflect the reality that take-or-leave contracts are, by definition, adhesion contracts whether or not they pertain only to voluntary recreational activities or amusements. Accordingly, in the future, I would recast the relevant prong of the exculpatory clause validity analysis as pertaining to whether the contract as a whole is unconscionable, and determine unconscionability based on general principles.

Justice BAER, concurring.

I fully agree with, and therefore join, the first part of the majority's opinion holding that the lawsuit brought by Appellees against Appellant ski resort is barred by Pennsylvania's Skier's Responsibility Act, 42 Pa.C.S. § 7102(c), because, pursuant to such Act, Appellee, Lori Chepkevich, assumed the risks inherent to the sport of downhill skiing, including the use of the ski lift involved in this matter.[1] In *Hughes v. Seven Springs*, 563 Pa. 501, 762 A.2d 339 (2000), our Court made it clear that the risks encompassed in the Skier's Responsibility Act include risks that are "common, frequent, and expected," not only to the activity of skiing down a hill, but also to those activities that are directly and necessary to the act of downhill

---

1. 42 Pa.C.S. § 7102(c), entitled "Downhill skiing" provides:

(1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

(2) The doctrine of voluntary assumption of risk as it applies to downhill skiing injuries and damages is not modified by subsections (a) and (b).

skiing such as "boarding the ski lift, riding the lift up the mountain, alighting from the lift, skiing from the lift to the trail and, after a run is complete, skiing toward the ski lift to start another run or skiing toward the base lodge or other facility at the end of the day." *Id.* at 344. Because application of the Act alone settles the question at issue in this case, I would find it unnecessary to address the propriety of the release issued by Appellant Hidden Valley and signed by Lori.[2]

Nevertheless, as the majority analyzes the validity of the release at issue and concludes that it also bars Appellees' lawsuit, I feel the need to comment, generally, about the validity of such releases and in particular about "the Release" at issue in this case. As noted by the majority, our Court, in *Topp Copy Prods. Inc. v. Singletary*, 533 Pa. 468, 626 A.2d 98 (1993), set forth the general standards governing the enforceability of exculpatory language contained in a release provision. Specifically, we stated that:

> It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs, and, thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion.

*Id.* at 99. We further noted that exculpatory language is not favored in the law and must be strictly construed against the drafter of the clause. *Id.* The majority concludes that the Release meets the necessary requirements for allowing an exculpatory clause to be enforced and holds that the Release is, therefore, valid. As to the first prong, regarding public

---

2. The Superior Court never addressed the propriety of the Act even though Hidden Valley raised the Act's applicability in the alternative as a basis to sustain the trial court's grant of summary judgment. As noted by the majority, the court solely addressed the Release, found it to be unenforceable, and simply reversed the trial court on this basis. Hidden Valley again raises the Act's applicability to our Court. If the Act applies to bar Appellees' lawsuit, however, review of whether the Superior Court properly found the Release unenforceable is not necessary.

policy, the majority notes that this requirement is met because, "the clear policy of this Commonwealth, as embodied by the [Skier's Responsibility] Act, is to encourage the sport and to place the risks of skiing squarely on the skier." Maj. Op. at 30, 2 A.3d at 1191.

The release at issue, however, seems to go beyond the risks encompassed within the public policy set forth in the Skier's Responsibility Act, which, as noted, insulates a ski resort from liability involving the inherent risks of skiing. The release employed by Appellant Hidden Valley in this case, which Lori signed, not only recognizes and insulates the resort from liability related to risks inherent to "[S]kiing, Snowboarding, and Snowblading, including the use of lifts," but also purports to insulate the resort from "other risks" associated therewith.

The majority recognizes as much in rejecting Appellees' argument that the Release only exempted Hidden Valley from liability when its negligence gave rise to a risk otherwise inherent to the sport of skiing and not negligence giving rise to other unexpected risks not inherent to the sport. The majority disagrees with Appellees' assertion in this regard and notes that the actual language of the Release is not limited to risks inherent to the sport of skiing, "but clearly includes, 'other risks.'" Maj. Op. at 34, 2 A.3d at 1194. The majority additionally notes that the Release states that "**All** the risks of skiing and boarding present risk of serious of fatal injury" and that the Release then absolves Hidden Valley of "these risks" regardless of negligence. *Id.* (emphasis in original).

In my view, to the extent the Release employed by Hidden Valley could be construed as exculpating it from liability as it relates to risks other than those inherent to the sport of skiing (i.e., the risks specified by our Court in *Hughes, see* supra. at 2), I would find that it contravenes the public policy of the Commonwealth as set forth in the Skier's Responsibility Act. *See Topp Copy; cf. Appeal of Diamond,* 413 Pa. 379, 196 A.2d 363 (1964) (by action or inaction, one may be deemed to have waived rights statutorily or constitutionally guaranteed where waiver is not contrary to public policy); *Smith v. Unemployment Compensation Bd. of Review,* 396 Pa. 557, 154

A.2d 492 (1959) (where statute expresses public policy designed to alleviate condition of possible distress among public, or segment thereof, and explicitly proscribes waiver of benefits of the act, no private agreement, however valid between the parties, can operate as such a waiver). As such, I would not find the Release enforceable if, in fact, the risks at issue were not ones inherent to the sport of skiing.[3]

Regardless, as I find it unnecessary to reach the issue of the Release's validity in this case, I would leave such question for another day.

3. I, likewise, share Mr. Justice Saylor's sentiment, expressed in his Concurring Opinion, that the type of release employed by Hidden Valley is, in fact, a contract of adhesion. I too would prefer an analysis of general principles of conscionability with regard to such a contract in any future case. I, therefore, join Justice Saylor's Concurring Opinion in this regard.